UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CHRISTOPHER ALVES,                    )
    Plaintiff,                      )
                        )
vs.                                   )
                        )
ROBERT MURPHY, Superintendent;        )     CIVIL ACTION
JOHN RULL, Captain; and               )     NO.
STEPHEN CORRIGAN, M.A., L.M.H.C.,     )
sued in their individual and          )
official capacities,                  )
    Defendant's.                    )

05 - 11090

Referred to MJ RB Collings

V E R I F I E D   C O M P L A I N T

INTRODUCTION:

    This is a Civil Rights Complaint, brought by Christopher Alves, pro-se, an involuntarily civilly committed resident at the Mass. Treatment Center, for damages and injunctive relief under 42 U.S.C. §1983, seeking enforcement of the terms and conditions of the "Management Plan for the Administration and Management of the Treatment Center." See King vs. Greenblatt, 53 F.Supp.2d 117, 137 (D.Mass. 1999)(civilly committed patients may bring a separate action seeking enforcement of the terms and conditions of the existing Management Plan). Plaintiff alleges that, defendant's knowingly placed him at risk of harm by failing to follow certain mandatory protocol's prior to im-plementing double-bunking of persons adjudicated as "sexually dangerous," put in place by this Court in King, to protect the rights of the civilly committed.

--2--

JURISDICTION:

1) This Court has jurisdiction over this action pursuant to 28 U.S.C. §§§1331-32 and 1343.

2) This Court has supplemental jurisdiction over any of the plaintiff's state law claims pursuant to 28 U.S.C. §1367.

3) This Court retains jurisdiction over plaintiff's request seeking enforcement of the terms and conditions of the Treatment Center's existing "Management Plan," because the [Plan] was put in place to remedy alleged wrongs. King, supra.

4) Plaintiff's claims for injunctive relief are properly authorized by 28 U.S.C. §§2283 and 2284 and by Rule 65 of the Federal Rules of Civil Procedure.

VENUE:

5) Venue properly lies in this District pursuant to 28 U.S.C. §1391, because all parties in this action reside, and/or are employed within the geographical jurisdiction of the above entitled Court, coupled with all allegations of violative conduct of plaintiff's federally protected rights, and the statutory laws of the United States, and the State of Massachusetts, all said violations did occur within the geographical jurisdiction of the above entitled Court.

PARTIES:

6) Plaintiff, Christopher Alves("Alves"), is and was at all relevant times herein, an adult citizen of the United States and resident of the Commonwealth of Massachusetts. Currently detained at the Mass. Treatment Center, at Bridgewater, County of Plymouth, Massachusetts. Under an Order of civil detention

-3-

from a Massachusetts Superior Court. Plaintiff is not serving a criminal sentence, nor is he a "prisoner," as that term is legally defined under the Prison Litigation Reform Act. Plaintiff sues in his own behalf.

7) Defendant, Robert Murphy("Murphy"), is and was at all relevant times herein, the Superintendent of the Mass. Treatment Center. At all relevant times herein defendant Murphy has acted under color of state law and is sued in his individual and official capacities.

8) Defendant, John Rull("Rull"), is and was at all relevant times herein, a Shift Commander with the Rank of Captain at the Mass. Treatment Center. At all relevant times herein defendant Rull has acted under color of state law and is sued in his individual and official capacities.

9) Defendant, Stephen Corrigan, M.A., L.M.H.C.("Corrigan"), is and was at all relevant times herein, an employee of Forensic Health Services, contracted by the Department of Correction to provide civilly committed residents, like the plaintiff, with certain specific sex offender treatment at the Mass. Treatment Center. At all relevant times herein defendant Corrigan has acted under color of state law and is sued in his individual and official capacities.

HISTORY OF THE TREATMENT CENTER AND THE PREVIOUS FEDERAL CONSENT DECREE LITIGATION:

10) Previously, G.L. ch.123A, 82 mandated that the Department of Mental Health ("DMH"), had responsibility for the care, treatment and rehabilitation of resident's with custodial per-

-4-

sonnel provided by the Department of Correction ("DOC"). See St.1959, ch.615, as appearing in G.L. ch.123A, 82.

11) This Court had previously entered consent decrees governing certain aspects of the operation of the Mass. Treatment Center ("MTC"), which incorporated this dual management scheme. See King vs. Greenblatt, 52 F.3d 1, 2-3 (1st Cir.), cert. denied, 516 U.S. 863 (1995) ("King I"); see also King vs. Greenblatt, 127 F.3d 190, 192 (1st Cir. 1997) ("King II"); King vs. Greenblatt, 149 F.3d 9 (1st Cir. 1998) ("King III"); King vs. Greenblatt, 53 F.Supp.2d 117, 118-20 (D.Mass. 1999).

12) On 1/14/94, the Legislature enacted St.1993, ch.489, 82, which amended G.L. ch.123A, 82 by placing sole authority and responsibility over the MTC with the DOC. See St. 1993, ch.489, 82, as appearing in G.L. ch.123A, 82. See King III, 149 F.3d at 11-12; King, 53 F.Supp.2d at 121.

13) As a result of this legislative change, in 1994 this Court (Mazzone, J.), began overseeing what ultimately became the final phase of the consent decree litigation.

14) Following the enactment of St.1993, ch.489, 82, the Commonwealth moved to vacate or in the alternative to modify the previously consent decrees by **substituting the DOC for DMH as the agency** designated to have primary responsibility and control for the MTC. King I, 52 F.3d at 3.

15) To prove to this court how it can effectively manage the MTC, the DOC submitted to this court an extensive Management Plan for the Administration of the MTC. King II, 127 F.3d at 193.

--5--

16) The Management Plan encompassed in detail almost every aspect of life at the MTC, including policies, regulations, and rules governing staffing, clinical treatment, educational and vocational treatment, a community access program, behavior management, and resident management operations. Id.; King III, 149 F.3d at 15.

17) This court permitted the DOC to implement this Plan and then modified the consent decrees to place responsibility for and control of the MTC with the DOC. King II, 127 F.3d at 194.

18) This court, however, did not vacate the previous consent decrees, King III, 149 F.3d at 16, but rather, this court elected to exercise close judicial oversight of the DOC's compliance with the consent decrees, King, 53 F.Supp.2d at 122--23, and ordered the DOC to submit an [amended] Plan addressing issues raised by the previous parties. Id.

19) Ultimately, after an evidentiary hearing, this court approved the DOC's Plan and terminated the previous consent decrees. King, 53 F.Supp.2d at 134--39.

STATEMENT OF RELEVANT FACTS:

20) The MTC was originally designed only to house persons declared by a court to be "sexually dangerous" under G.L. ch.--123A, 1/ with a maximum capacity of 216. Comprising of four

_____

[1] The provisions of G.L. ch.123A that provided for the commitment of "sexually dangerous persons," G.L. ch.123A, §§3--6 and 7, were re--pealed between 1990 and 1999. See St.1990, ch.150, §304. Civil commit--ments were reinstated in 1999. See St.1999, c.74, as appearing in G.L. Ch.123A, §§1, 12--16; see also Commonwealth vs. Bruno, 432 Mass. 489, 491--97 (Mass. 2000)(detailing the reinstatement of civil commitments).

--6--

separate housing units: A1--A2, B1--B2, C1--C2, and D1--D2. Units
A1, B1, C1, and D1 have twenty--four room each, while units A2,
B2, C2, and D2 have thirty room each. See King, 53 F.Supp.2d at
125.

21) Currently, the MTC houses four separate populations:
(1) the existing civil population, committed under the pre--ex-
isting versions of ch.123A; (2) the new civil population, comm-
itted under the existing version of ch.123A; (3) the new civil
population, "temporarily" committed under the existing version
of ch.123A, awaiting trial 2/; and (4) approximately 300 state
prisoner still serving criminal sentences convicted of a sexual
offense.

22) With the re--enactment of civil commits under ch.123A,
the MTC has faced a serious over--crowding, forcing the defendant's
to institute double--bunking of residents declared "sexually dang-
erous."

23) The Amended Management Plan did not contemplate that
double--bunking would become necessary. However, holds that, if
double--bunking became necessary in the future, defendant's are
required to follow "the protocols described in the original
Plan." See attached hereto and marked as Exhibit--1. (Herein--
after "Ex.--  ").

---------------------------------------------------------------
[2] This population currently comprising 1½ housing units (D1--D2, and C1).
Which is growing rapidly on a 'daily' basis, causing the civilly committed
population to be over--crowded and deprived access to the main facility.

--7--

24) The original Plan questioned whether double-bunking is suitable and appropriate for the specific population of the MTC, and contains specific policies and procedures for implementation of double-bunking should it become necessary. Ex.--2.

25) The provisions contain a two-phase system. Whereas, Phase-I consists of requiring defendant's to attempt to relieve the over-crowding prior to double-bunking, by reassignment of housing after operation of the Transfer Board Process, 3/ and Phase-II requiring defendant;s to conduct "security" and "clinical" assessments of each resident's "compatibility" and "suitability" for double-bunking. Id.

26) These protocols were put in place and approved by this court to ensure for the constitutional rights of the civilly committed, including the plaintiff's.

27) In and around February, 2004, defendant's Rull and Corrigan conducted an interview and assessment of plaintiff's compatibility for double-bunking.

28) During this assessment, defendant's requested of plaintiff whether he would consider being double-bunked with resident John MacIntyre.

29) Resident John MacIntyre was originally convicted of raping an adolescent male, and recently exhibited a lack of impulse control by escaping from the Treatment Center's Community

---

[3] Ex.--1 at page--2. See also 103 CMR 460.00 ("Transfer Procedures for the Massachusetts Treatment Center").

--8--

Access House.

30) Plaintiff informed defendant's Bull and Corrigan that he did not feel comfortable being double-bunked with resident MacIntyre because he had just recently escaped from the Treatment Center, and requested to be housed with either resident John Parker or resident Charles March.

31) Defendant's informed plaintiff that he had no choice but to double-bunk with resident MacIntyre or be removed from general population, placed in the Treatment Center's Minimum Privilege Unit pending a Observation of Behavior Report.

32) In and around May, 2004, plaintiff informed defendant Bull during an administrative access hour that, for several nights he would awake to find resident MacIntyre lifting up his bed sheets looking at him and felt that resident MacIntyre was putting medication in his food.

33) Plaintiff was immediately thereafter moved to a single room temporarily, then shortly thereafter reassigned another roommate in a housing unit separate from resident MacIntyre.

34) On 5/25/04, plaintiff made WRITTEN DEMAND, under G.L. ch.258, §4, upon the defendant's for their negligence in double-bunking him with a known homosexual. Ex.-3.

35) On 5/28/04, defendant's acknowledged receipt of plaintiff's written demand, ex.-4, though have failed to reply therefrom.

36) Defendant's knew, or should have known that, double bunking a resident convicted of and sexually attracted to adolescent males, with another resident who projects adolescent

-9-

mannerisms and characteristics would create a foreseeable risk
of harm while double-bunked.

37) Plaintiff, though admittedly of age, projects adolescent
mannerisms and characteristics.

38) Upon information and belief, defendant's ignore and do
not follow the protocol's for assessing resident's suitability
and compatibility for double-bunking.

39) Upon further information and belief, defendant's ignore
and do not investigate resident's complaints of not being suit-
able or compatible with their assigned **roommates**.

40) Upon further information and belief, defendant's know-
ingly double-bunk known homosexuals with other known homosexuals.

41) Upon further information and belief, double-bunking
homosexuals with other homosexuals provides unlimited opportunities
to engage in sexual activity, which is both counter-productive
to treatment, against institutional regulations, as well as in-
creases the risk of sexually transmitted diseases.

42) Upon further information and belief, the protocol's
attached as exhibit-2, supra, infer that double-bunking is
"optional" to single-room housing, though does not specifically
define what situations would necessitate a single-room.

43) Upon further information and belief, double-bunking
"sexually dangerous persons" has proven not to be suitable for
the population of the MTC.

44) Upon further information and belief, defendant's afford
the existing population committed under the pre-existing versions
of ch.123A the privilege to retain at their own expense certain

--10--

personal luxuries, 4/ while denying the new population committed
under the 1999 version of ch.123A the privilege to retain at
their own expense the same level of personal luxuries.

45) Upon further information and belief, housing and double
bunking the two existing population, while affording differential
privileges to one population and not the other, causes hostility,
friction, jealously, incompatibility, mental anguish, animosity,
and facilitates strongarming, as well as creating an unconstitut-
ional "sub-class" of residents within the MTC.

46) Upon further information and belief, since the implemen-
tation of double-bunking at the MTC, there has been a significant
**increase** in unauthorized sexual activity, physical altercations,
strongarming, extortion, and other illicit and harmful activities.

47) Upon further information and belief, the Housing and
Double-Bunking Plan in the MTC's existing Management Plan, infers
that the defendant's should attempt to relieve the overcrowding
prior to implementing double-bunking.

48) Upon further information and belief, with the reenactment
of new civil commits in 1999, defendant's no longer have the dis-
cretion under St.1990, c.150, §§104 & 304 "to utilize any space
at the MTC for state prisoners."

--------------------------------------------------
[4] The existing Management Plan recognizes that the MTC and its pop-
ulation is "unique in nature." And therefore, authorized property for
retention. Such, as: T.V. with speakers & remote; Stereo's with remote
and external speakers; Personal computers with printers; electronic
games; electronic hair & beard trimmers; electronic lamps & clocks;
walkman type radios; headphones; and an assortment of personal clothing
& linen of their choice. While the new population, is only allowed to
retain the same level of personal property that state prisoners are
allowed.

--11--

CAUSES OF ACTION:

49) Plaintiff realleges and incorporates by reference his allegations in paragraphs 1 through 48 of his Complaint as if fully set forth herein.

50) At all relevant times herein, defendant's were "persons" for the purpose of 42 U.S.C. 81983 and have acted under "color of state law" to deprive the plaintiff of his administrative and constitutional rights.

51) The actions of the defendant's as stated in paragraphs 22-25 in implementing Phase-II prior to Phase-I, violated the "terms and conditions" of the existing Management Plan, in violation of plaintiff's administrative, state and federal constitutional rights.

52) The actions of the defendant's as stated in paragraphs 27-37 in double-bunking the plaintiff with resident John MacIntyre, violated the "terms and conditions" of the existing Management Plan, in violation of plaintiff's administrative, state and federal constitutional rights.

53) the actions of the defendant's as stated in paragraphs 40-41 in housing and double-bunking known homosexuals with each other, violated the "terms and conditions" of the existing Management Plan, as well as increases the "risk" of sexually transmitted diseases, in violation of plaintiff administrative, state and federal constitutional rights.

54) The actions of the defendant's as stated in paragraphs 44-45 in affording differential privileges between the existing populations, has unconstitutionally created a "sub-class" of

--12--

residents within the MTC, in violation of plaintiff's administ-
rative, state and federal constitutional rights.

PRAYERS FOR RELIEF:

WHEREFORE, the Plaintiff prays that this Court grant him
the following relief:

(a) Issue a declaratory judgment that the defendant's
actions and behaviors as set forth in the Complaint violated
the plaintiff's rights under the "terms and conditions" of the
existing Management Plan, as well as under the state and federal
constitutions;

(b) Issue an injunction compelling the defendant's to pro-
vide evidence that double-bunking of "sexually dangerous persons"
has proven suitable for the population at the MTC;

(c) Issue an injunction compelling the defendant's to ex-
pand and elaborate on the existing "double-bunking plan," by:
(1) clarifying issues pertaining to compatibility; (2) clarifying
what medical, hygiene, and religious matters would necessitate
single-room housing; (3) enact a procedure for investigating
and responding to residents complaints of being unsuitable and
uncompatible with their individually assigned roommates; and (4)
enact a procedure, whereas, residents with the highest privilege
be considered priority for single-room housing; and those residents
with the least privilege be considered priority for double-
bunking;

(d) Issue an injunction compelling the defendant's from
immediately refrain from double-bunking all known homosexuals;

(e) Issue an injunction compelling the defendant's to pro--

--13--

vide all new residents committed under the 1999 version of ch.123A the privilege to retain at their own expense the same level of personal luxuries afforded the existing populations committed under the pre-existing versions of ch.123A;

(f) Issue an injunction compelling the defendant's to imm--ediately attempt to relieve the overcrowding by transferring **all state prisoners and civilly committed residents still serving criminal sentences** at the MTC;

(g) An award of damages, attorney fees, costs, and interest incurred in this action; and

(h) Such other and further relief as this Court deems just and proper.

Dated: 5/23/05 .             Respectfully submitted,

                            _Christopher Alves_
                            Christopher Alves, #M-81271
                            Plaintiff/Pro-se
                            Mass. Treatment Center
                            30 Administration Rd.
                            Bridgewater, Mass. 02324-3230


## CERTIFICATE OF VERIFICATION

I, Christopher Alves, plaintiff in the enclosed matter, acting pro-se, hereby **verify's** that all of the information contained in the Complaint is true and accurate to the best of my personal knowledge and belief and my records show them to be, except as to those matters alleged upon information and belief, and as to those matters I believe them to be true and accurate to the best of my personal knowledge and belief.

Dated: 5/23/05 .    _Christopher Alves_
                    Christopher Alves, #M-81271
                    Plaintiff/Pro-se

**EXHIBIT**

1

(Page 1 of 2)

# COMMONWEALTH OF MASSACHUSETTS

# DEPARTMENT OF CORRECTION

# AMENDED MANAGEMENT PLAN

# FOR THE

# ADMINISTRATION OF THE

# TREATMENT CENTER

November 29, 1996

offender treatment aftercare program. 103 DOC 446.01.[22] Inmates "in denial" of their sex offenses may participate in the program through Phase III, but no inmate "in denial" may advance beyond Phase III. 103 DOC 446.02(D)(4).

Over 500 prisoners currently participate in this voluntary program. At medium security, the program is located at the Southeastern Correctional Center, MCI-Concord and the North Central Correctional Center.. At minimum security, the program is located at the Pondville Correctional Center, the Southeastern Correctional Center (minimum), MCI-Shirley (minimum) and the Northeastern Correctional Center. In addition, a sex offender program for women is run at MCI-Framingham.

B.    <u>Management of an Expanded Treatment Center Population</u>

The original plan contemplated that prisoners enrolled in the intensive treatment phase of the prison sex offender program could be brought into the Treatment Center if the institution instituted double bunking for some civilly committed residents as well as for the new admissions. However, due to the gradual decline of the civilly committed population in conjunction with the space freed up by the opening of the pre-transition program, it was possible to relocate the intensive treatment phase (Phase IV) of the prison sex offender treatment program from the Southeastern Correctional Center into the D-2 Unit of the Treatment Center. New furnishings permit double bunking in D-2. At this juncture, no double bunking is contemplated for civilly committed residents. If this option were to become desirable at some time in the future, the Department of Correction will follow the protocols described in the original plan.

With the anticipated opening of the modular expansion unit in the Spring of 1997 and the admission of 300 new sex offenders, the challenge is no longer to find bed space but to utilize the existing resources in the most efficient manner to ensure that program opportunities for civilly committed residents will be fully maintained, while providing for the needs of the new population. By

---

[22] The policy excluding untreated sex offenders from community access will be memorialized in statute. St. 1996, c. 239, § 3 (signed August 5, 1995 and effective November 3, 1996), amends G.L. c. 127, § 49, governing participation of inmates in programs outside correctional facilities, as follows:

The first paragraph of section 49 of chapter 127 of the General Laws, as so appearing, is hereby amended by adding the following two sentences:- No sex offender in the custody of the department of correction shall be eligible to participate in a program outside a correctional facility established under section forty-eight unless he has completed the department's voluntary sex offender treatment program. The voluntary sex offender treatment program shall be administered pursuant to the rules and regulations of the department.

EXHIBIT

2

(Page 1 of 3)

# COMMONWEALTH OF MASSACHUSETTS

# DEPARTMENT OF CORRECTION

# MANAGEMENT PLAN

# FOR THE

# ADMINISTRATION OF THE

# TREATMENT CENTER

September 26, 1994

135

C.  Housing and Double Bunking Plan

Currently, the Treatment Center has 216 rooms in the general population housing units. Five are reserved for persons with physical disabilities. Of the 215 current residents, 208 are housed in general population rooms, one permanently in the Health Services Unit, and six in the Transition House. Therefore, in order to implement the integration plan, the Department of Correction needs to be able to expand the housing capacity.

The primary concern in considering double bunking is whether this practice is suitable and appropriate for the resident population. Dr. Pithers suggests that double bunking offers a therapeutic advantage over single room housing by providing residents the opportunity to develop essential relationship and social skills. Double bunking is used successfully in sex offender treatment programs in other states, including New Mexico, Wisconsin and Washington. Nor would double bunking be a new concept for the Treatment Center. The old facility, in use until 1986, housed residents in dormitory style rooms. Currently, four residents double bunk by their own choice at the Center.

The Department of Correction plans a two-phase system. JRI suggests that in the first instance, double bunking may not be required. JRI believes that approximately 40 residents will meet the criteria for return to the prisons by the Transfer Board process. This will essentially reduce the population by more than the equivalent of one thirty-bed housing unit. If one housing unit can be emptied and designated for new prisoners, it can be double bunked to provide 60 beds. The SECC unit will provide another 60 beds for a total of 120 new participants. Therefore, Phase I will involve reassignment of housing after operation of the Transfer Board process in order to make an entire unit available to double bunk new admissions. The Department will not house persons committed under Chapter 123A with new admissions from the prisons.

If it becomes necessary to further increase the housing capacity of the Treatment Center, the Department will institute Phase II. The components of Phase II of the Department of Correction plan for double bunking are the following:

1.  The existing population will continue to be housed separately from the new admissions. Accordingly, no resident committed under Chapter 123A would share a room or a housing unit with the new admissions.

Christopher Alves, #M-81271
Mass. Treatment Center
30 Administration Rd.
Bridgewater, Mass. 02324



**EXHIBIT**

3

(Page 1 of 9)

_____

Dated: 5/25/04.

Attorney General
Executive Office of Public Safety
1 Ashburton Place, 20th Flr.
Boston, Mass. 02108

RE: DEMAND LETTER, Under Mass. General Laws Chapter 258, Section 4.

To Attorney General:

As the executive officer of all those subordinates employed at the Mass. Treatment Center, WRITTEN DEMAND is hereby made upon you, under the provisions of M.G.L. Ch.258, §4, for placing me at risk by negligently disregarding certain administrative assessment protocol's, prior to my being double-bunked, as follows:

## Brief History of the MTC and the Federal Consent Decree Litigation

The Treatment Center has previously been under dual management. For more than three decades, G.L. Ch.123A, §2 mandated that the Department of Mental Health ("DMH"), had responsibility for the care, treatment and rehabilitation of Sexually Dangerous Person's ("SDP"), with custodial personnel provided by the Department of Correction ("DOC"). See St.1959, c.615, as appearing in G.L. Ch.123A, §2. The United States District Court for the District of Massachusetts had previously entered consent decrees governing certain aspects of the operation of the Treatment Center, which incorporated this dual management. See King vs. Greenblatt ("King I"), 52 F.3d 1, 2-3 (1st Cir.), cert. denied, 516 U.S. 863 (1995). Among other things, the consent decrees mandated that Treatment Center residents "have the least restrictive conditions necessary to achieve the purpose of commitment." Id.; see also King vs. Greenblatt ("King II"), 127 F.3d 190, 192 (1st Cir. 1997); King vs. Greenblatt, 149 F.3d 9 (1st Cir. 1998)("King III"); King vs. Greenblatt, 53 F.Supp.2d 117, 118-20 (D.Mass. 1999)(detailing changes in conditions at the Treatment Center from 1972 to 1992).

On January 14, 1994, the Legislature enacted St.1993, c.489, §2, which amended G.L. Ch.123A, §2, by placing sole authority and responsibility over the Treatment Center with the DOC. St.1993, c.489, §2, as appearing in G.L. Ch.123A, §2. See King III, 149 F.3d at 11-12; King, 53 F.Supp.2d at 121.

As a result of this change, in 1994, the Federal District Court (Mazzone, J.), began overseeing what ultimately became the final phase of the federal consent decree litigation. In 1994, the Federal District Court appointed the law firm of Hale and Dorr to represent forty-nine SDP's who called themselves

In re; Christopher Alves, #M-81271                                    Page-2

the "Class of 48 + 1" and alleged a number of violations of their state and federal constitutional rights. <u>King</u>, 53 F.Supp.2d at 121.

The Federal District Court re-opened another consent decree case concerning the Treatment Center, <u>Harold G. Williams, et al. vs. Michael Lesiak, et al.,</u> U.S.Dist.Ct.C.A.No.72-571-ADM, and consolidated it with <u>Mitchell G. King, et al. vs. Milton Greenblatt, M.D., et al.,</u> U.S.Dist.Ct.C.A.No.72-788-ADM, the case involving the Class of 48 +1(together "the federal consent decree litigation"). <u>King,</u> 53 F.SUpp.2d at 121.

Following the enactment of St.1993, c.489, §2, the Commissioner moved to vacate or in the alternative to modify the consent decrees by substituting DOC for DMH as the agency designated to have primary responsibility and control for the facility. <u>King I,</u> 52 F.3d at 3. In 1994, DOC submitted to the Federal Court an extensive Management Plan for the administration and management of the Treatment Center (the "original Management Plan"). <u>King II,</u> 127 F.3d at 193. The Management Plan encompassed in detail almost every aspect of life at the Treatment Center, including policies, procedures, regulations, and rules governing staffing, clinical treatment, educational and vocational treatment, a community access program, behavior management, and resident management operations. Id.; <u>King III,</u> 149 F.3d at 15. In 1996, the Federal District Court permitted the DOC to implement its Plan and modified the consent decrees to place responsibility for custody and control of the Treatment Center in DOC. <u>King II,</u> 127 F.3d at 194.

The Federal District Court, however, did not vacate the consent decrees. <u>King III,</u> 149 F.3d at 16. Instead, the Federal District Court elected to exercise close judicial oversight of DOC's compliance with the consent decrees. Id. at 122-23; <u>King,</u> 53 F.Supp.2d at 122-23. Additionally, the District Court ordered the DOC to submit an amended Plan addressing issues raised by the parties. The [Amended Plan] was filed on November 29, 1996. <u>King,</u> 53 F.Supp.2d at 122. <u>1/</u>


## Termination of the Previous Federal Consent Decrees

From 1994 to June, 1999, the Federal District Court approved, oversaw, and monitored DOC's assumption of sole control over the Treatment Center, including the DOC's expansion of sex offender treatment services at the Treatment Center to non-civilly committed state prison inmates ("SPI's"). See, e.g., <u>King,</u> 53 F.Supp.2d at 121-23. Throughout that period, the SDP's continued to assert that the DOC's policies and procedures and its introduction of the SPI's into the facility "essentially turned the Treatment Center into a prison and fundamentally altered the therapeutic community." <u>King III,</u> 149 F.3d at 16. They also complained that DOC's new rules and regulations and the additional SPI population impaired or affected treatment so as to render it ineffective and in violation of G.L. Ch.123A and the consent decrees. <u>King,</u> 53 F.Supp.2d at 123, 135.

---

[1] Collectively, the original Plan filed in 1994, and the Amended Plan filed in 1996 will be referred to as the "Management Plan's." It is these Plan's which continue to be the basic blueprint for the Treatment Center's Administration and Management. See, e.g,, <u>King,</u> 53 F.SUpp.2d at 137("I believe the Management Plan is an 'enforceable' operating document")(emphasis added).

In re: Christopher Alves, #M-81271                                    Page-3

    This final phase of the consent decree litigation culminated in an
evidentiary hearing before the Federal District Court in March, 1999. See
King, 53 F.Supp.2d at 124. At the hearing, SDP's reiterated their numerous
complaints about the DOC's operation of the Treatment Center. See King,
53 F.Supp.2d at 129-31, 134-35. After the hearing, the Federal District
Court terminated, rather than vacated the consent decrees. King, 53 F.Supp.2d
at 136, 139. In doing so, the Federal District Court determined that the
SDP's complaints about the DOC's policies, procedures, rules, and regulations
as well as their complaints about the presence of the SPI's in the Treatment
Center, taken as a whole, did not render treatment ineffective, did not vio-
late G.L. Ch.123A, and did not violate the consent decrees. King, 53 F.Supp.2d
at 135, 137. See King III, 149 F.3d at 19.

### The Management Plan's and Assessment Protocol's for Implementing Double-Bunking of SDP's

    The Management Plan's include provisions for "double-bunking" of SDP's,
including the policies and procedures for its implementation should it be-
come necessary. In the 1996 Amended Plan, the DOC represented to the District
Court that it was not contemplating double-bunking SDP's at that time due to
a gradual decline of the population of SDP's. The DOC did represent that,
should double-bunking become necessary in the future, the policies and pro-
cedures outline in the original (1994) Management Plan would be followed. The
1994 original Management Plan contains strict mandatory procedures for the
implementation of double-bunking. 2/ Which include, but not limited to, the
Director of Security and his staff, as well as the individual resident's Treat-
ment Team to assess various concerns prior to double-bunking two SDP's in the
same room. These procedures were put in place to ensure for the safety, com-
patibility, and well being of SDP's while double-bunked. Id. at Ex.-1.

    In or about February, of 2004, I was informed by the shift commander,
Captain Rull, and my Treatment Therapist, Mr. Steve Corrigan, that I was to
be double-bunked. At this time I was only asked who I preferred to be double
bunked with. In reply, I informed Captain Rull and Mr. Corrigan that I would
feel comfortable with either resident Marsch or Parker. I was then asked what
about resident John MacIntyre. I then informed Captain Rull and Mr. Corrigan
that I would not feel comfortable or safe around this individual, as he has
just exhibited a lack of impulse control by escaping from this facility. I
was informed that I'd have to try and get along with resident MacIntyre be-
cause that is who they felt I was most compatible with. 3/ I was then asked

---

[2] Attached are the relevant pages of the "double-bunking procedures,"
and marked as Exhibit-1.

[3] It is noted here that, resident MacIntyre was originally convicted for
raping an adolescent male, and is a known homosexual at the Treatment Center,
who has continually engaged in illicit homosexual behaviors with other re-
sidents while civilly committed.

In re: Christopher Alves, #M-81271                                    Page-4.

if I was refusing to be double-bunked, and I replied no. Though I again re-iterated my concerns about being double-bunked with resident MacIntyre.

On May 13, 2004, I spoke with Captain Rull at an administrative access period, and informed him that I urgently needed to see some one in private. Captain Rull asked me what it concerned. I informed Captain Rull that I felt that my rommate, resident MacIntyre was trying to put drugs in my food and rape me. I then was seen by C.O. Clause of the Treatment Center's Inner Perimeter Security. I informed C.O. Clause that the night prior resident MacIntyre had gave me two sandwiches and a brownie that tasted like it had some kind of medicine in it, and that for the past few nights I'd awake in the middle of the night to find him lifting up my sheets to look at me while I was sleeping. I informed C.O. Clause that I felt very uncomfortable and at risk being double-bunked with resident MacIntyre. Later that same day I was temporarily moved to another unit and placed in a single room, awaiting to be double-bunked once again. Because it was my word against resident MacIntyre's, and he was denying the incident, nothing happened to him, and my allegations were gone unsubstantiated.

In closing, please note that I anticipate upon your review and invest-igation of the enclosed, though admittedly, because it was my word against resident MacIntyre's, the incident in question could not be documented. I am sure you will find that, all of the assessment protocol's listed in Ex.-1 were clearly not followed. Specifically, upon assessing my compatibility for double-bunking, your clients knew, or should have known that, though I am of age, I clearly project adolescent characteristics/mannerisms, and because re-sident MacIntyre was originally convicted for raping an adolescent male, and moreover, has engaged in illicit homosexual behaviors while in custody, that there existed a "risk" I would be susceptible to victimization by resident MacIntyre, whom additionally, is twice my size and strength. See Ex.-1 attached; see also, e.g., <u>Doe vs. Lally</u>, 467 F.Supp. 1339, 1356 (D.Md. 1979)(holding that "the state should make every effort to identify victims of [sexual] assault early in the initial classification process"); see also, e.g., <u>U.S. vs. Lara</u>, 905 F.2d 599 (2d Cir. 1990); <u>U.S. vs. Gonzalez</u>, 945 F.2d 525 (2d Cir. 1991). A "physical injury" need not be made in order to make a claim, or cause lasting or permanent harm. See, e.g., <u>Hicks vs. Frey</u>, 992 F.2d 1450, 1457 (6th Cir. 1993)("Extreme conduct by custodians that causes severe emot-ional distress is sufficient"); <u>Scher vs. Engelke</u>, 943 F.2d 921, 924 (8th Cir. 1981)(evidence of "fear, mental anguish and misery" can establish the requisite injury for an Eighth Amendment claim), cert. denied, 112 S.Ct. 1516 (1992); see also, e.g., <u>Boretti vs. Wiscomb</u>, 930 F.2d 1150, 1154-55 (6th Cir. 1991); <u>Jackson vs. Cain</u>, 864 F.2d 1235, 1247 (5th Cir. 1989); <u>Foulds vs. Corley</u>, 833 F.2d 52, 55 (5th Cir. 1987); see <u>Corselli vs. Coughlin,</u> 842 F.2d 23, 26 (2d Cir. 1998). As such, <u>DEMAND</u> is hereby made upon you in the amount of $100,000.00 for your employee's above negligence in placing me at "risk," and disregarded the attached mandatory protocol's. <u>4/</u> If no such

_____

[4] It is noted that the exact dollar amount is open to negotiations.
It is further noted here that, I am open to waiving any damage claims, in exchange for permanent single room housing while in custody at the MTC.(My concerns for my safety or more important than money damages).

In re: Christopher Alves, #M-81271                                    Page-5.

offer is received within the statutory time period of six months, please
note that I fully intend on seeking a Complaint and multiple damages, along
with my interest and costs. 5/ See, e.g., King, 53 F.Supp.2d at 137("civilly
committed residents may bring a separate action seeking to enforce the terms
and conditions of the existing Management Plan's").

    Lastly, please also note to ensure better delivery I am mailing this
DEMAND via first class mail, postage prepaid, certified mail, return re-
ceipt requested.


    Thank you for your consideration and attention in the enclosed matter.
I patiently await your reply.



Sincerely,


Christopher Alves, #M-81271
Complainant/Pro-se


cc: C.A.(FILE)
    Brian P. Mansfield, Esq.(MTC Legal Division)
    Certified Mail No. 7002 2410 0004 4648 6257

_____

[5] Please note that, as a Complaint has previously been filed in Michael
Cote, et al. vs. Robert Murphy, Superintendent et al., U.S.Dist.Ct.C.A.No.
03-10716-DPW(alleging similar claims, along with constitutional challenges
to double-bunking of SDP's), I do not think the Court will look lightly on
your clients continual failure to follow the mandatory protocol's in assessing
SDP's compatibility prior to double-bunking, nor it's failure to try and re-
solve this matter out-of-court.

E X H I B I T - 1

# COMMONWEALTH OF MASSACHUSETTS

# DEPARTMENT OF CORRECTION

# MANAGEMENT PLAN

# FOR THE

# ADMINISTRATION OF THE

# TREATMENT CENTER

**September 26, 1994**

135

C.   Housing and Double Bunking Plan

Currently, the Treatment Center has 216 rooms in the general population housing units. Five are reserved for persons with physical disabilities. Of the 215 current residents, 208 are housed in general population rooms, one permanently in the Health Services Unit, and six in the Transition House. Therefore, in order to implement the integration plan, the Department of Correction needs to be able to expand the housing capacity.

The primary concern in considering double bunking is whether this practice is suitable and appropriate for the resident population. Dr. Pithers suggests that double bunking offers a therapeutic advantage over single room housing by providing residents the opportunity to develop essential relationship and social skills. Double bunking is used successfully in sex offender treatment programs in other states, including New Mexico, Wisconsin and Washington. Nor would double bunking be a new concept for the Treatment Center. The old facility, in use until 1986, housed residents in dormitory style rooms. Currently, four residents double bunk by their own choice at the Center.

The Department of Correction plans a two-phase system. JRI suggests that in the first instance, double bunking may not be required. JRI believes that approximately 40 residents will meet the criteria for return to the prisons by the Transfer Board process. This will essentially reduce the population by more than the equivalent of one thirty-bed housing unit. If one housing unit can be emptied and designated for new prisoners, it can be double bunked to provide 60 beds. The SECC unit will provide another 60 beds for a total of 120 new participants. Therefore, Phase I will involve reassignment of housing after operation of the Transfer Board process in order to make an entire unit available to double bunk new admissions. The Department will not house persons committed under Chapter 123A with new admissions from the prisons.

If it becomes necessary to further increase the housing capacity of the Treatment Center, the Department will institute Phase II. The components of Phase II of the Department of Correction plan for double bunking are the following:

1.   The existing population will continue to be housed separately from the new admissions. Accordingly, no resident committed under Chapter 123A would share a room or a housing unit with the new admissions.

136

2.    The Director of Security and his staff will conduct security assessments for each resident to gauge:

a.    Escape risk and history. No two residents with high escape risks will be roomed together;

b.    Enemy situations. Residents will not be roomed or housed with others where there is a documented problem;

c.    Aggression. Aggressive residents will not be housed with persons who are susceptible to victimization; and

d.    Compliance. Residents who have failed to comply with the rules and procedures of the facility will be screened for proper placement and rooms.

3.    The clinical treatment teams will perform clinical assessments to gauge:

a.    Compatibility of residents for double bunking;

b.    Medical issues, such as sleeping disorders, physical needs for lower bunks, hygiene and any other medical matters affecting double bunking;

c.    Religious beliefs, where residents asserts beliefs precluding double bunking or limit their compatibility; and

d.    Consideration and assessment of residents' requests and preferences for assignments.

4.    A description of the physical characteristics of the rooms and a four-phase implementation plan is attached at Appendix 32.

EXHIBIT

tabbies    4

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Attorney General
One Ashburton Place, 20th Flr.
Boston, Mass. 02108

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (Please Print Clearly)    B. Date of Delivery
MAY 28 2004

C. Signature
William J Coughlan
☐ Agent
☐ Addressee

D. Is delivery address different from item 1?    ☐ Yes
If YES, enter delivery address below:    ☐ No

3. Service Type
☒ Certified Mail    ☐ Express Mail
☐ Registered    ☐ Return Receipt for Merchandise
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number (Copy from service label)

7002 2410 0004 4648 6257

PS Form 3811, July 1999        Domestic Return Receipt        102595-99-M-1789

---

**U.S. Postal Service**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

From: Christopher Alves #M-81271

| | | |
|---|---|---|
| Postage | $  .83 | MTC |
| Certified Fee | 2.30 | |
| Return Reciept Fee (Endorsement Required) | 1.75 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | | |
| Total Postage & Fees | $ | |

Sent To    Attorney General
Street, Apt. No.; or PO Box No.    One Ashburton Place, 20th Flr.
City, State, ZIP+4    Boston, Mass. 02108

PS Form 3800, June 2002        See Reverse for Instructions

7002 2410 0004 4648 6257

JS 44
(Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I.(a) PLAINTIFFS

Christopher Alves

## DEFENDANTS

Robert Murphy, Superintendent, et al.,

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   Plymouth
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   Plymouth
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Pro-se
Mass. Treatment Center
30 Administration Rd.
Bridgewater, Mass. 02324-3230

ATTORNEYS (IF KNOWN)

N/A

05 - 11090 MLW

## II. BASIS OF JURISDICTION   (PLACE AN "X" IN ONE BOX ONLY)

☐ 1  U.S. Government Plaintiff

☒ 3  Federal Question (U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES   (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)   AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — Med. Malpractice | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury — Product Liability | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 650 Airline Regs. | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 810 Selective Service |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 690 Other | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☒ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS — Third Party 26 USC 7609 | |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN   (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

Transferred from
☐ 5 another district (specify)

☐ 6 Multidistrict Litigation

Appeal to District Judge from
☐ 7 Magistrate Judgment

## VI. CAUSE OF ACTION   (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

This is a Section 1983 Action. Whereas, the plaintiff alleges that, defendant's knowingly placed him at "risk" of being sexually assaulted by failing to follow certain mandatory protocol's in double-bunking of "sexually dangerous persons."

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ YES   ☒ NO

## VIII. RELATED CASE(S) IF ANY   (See instructions):

JUDGE _____   DOCKET NUMBER _____

DATE   5/23/05

SIGNATURE OF ATTORNEY OF RECORD   Christopher Alves

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. TITLE OF CASE (NAME OF FIRST PARTY ON EACH SIDE ONLY)  Christopher Alves vs.
Robert Murphy, Superintendent, et al.

2. CATEGORY IN WHICH THE CASE BELONGS BASED UPON THE NUMBERED NATURE OF SUIT CODE LISTED ON THE CIVIL
COVER SHEET.  (SEE LOCAL RULE 40.1(A)(1)).

____  I.    160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

_X_  II.    195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,      *Also complete AO 120 or AO 121
            740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.         for patent, trademark or copyright cases

____  III.   110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
            315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
            380, 385, 450, 891.

____  IV.   220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
            690, 810, 861-865, 870, 871, 875, 900.

____  V.    150, 152, 153.

3. TITLE AND NUMBER, IF ANY, OF RELATED CASES. (SEE LOCAL RULE 40.1(G)). IF MORE THAN ONE PRIOR RELATED CASE
HAS BEEN FILED IN THIS DISTRICT PLEASE INDICATE THE TITLE AND NUMBER OF THE FIRST FILED CASE IN THIS COURT.

      N/A

4. HAS A PRIOR ACTION BETWEEN THE SAME PARTIES AND BASED ON THE SAME CLAIM EVER BEEN FILED IN THIS
COURT?
                                                        YES        NO   X

5. DOES THE COMPLAINT IN THIS CASE QUESTION THE CONSTITUTIONALITY OF AN ACT OF CONGRESS AFFECTING THE
PUBLIC INTEREST?   (SEE 28 USC §2403)
                                                        YES        NO   X
   IF SO, IS THE U.S.A. OR AN OFFICER, AGENT OR EMPLOYEE OF THE U.S. A PARTY?
                                                        YES        NO

6. IS THIS CASE REQUIRED TO BE HEARD AND DETERMINED BY A DISTRICT COURT OF THREE JUDGES PURSUANT TO TITLE
28 USC §2284?
                                                        YES        NO   X

7. DO ALL OF THE PARTIES IN THIS ACTION, EXCLUDING GOVERNMENTAL AGENCIES OF THE UNITED STATES AND THE
COMMONWEALTH OF MASSACHUSETTS ("GOVERNMENTAL AGENCIES"), RESIDING IN MASSACHUSETTS RESIDE IN THE
SAME DIVISION? - (SEE LOCAL RULE 40.1(D)).
                                                        YES   X    NO

   A.    IF YES, IN WHICH DIVISION DO ALL OF THE NON-GOVERNMENTAL PARTIES RESIDE?

         EASTERN DIVISION            CENTRAL DIVISION            WESTERN DIVISION
              X
   B.    IF NO, IN WHICH DIVISION DO THE MAJORITY OF THE PLAINTIFFS OR THE ONLY PARTIES, EXCLUDING
         GOVERNMENTAL AGENCIES, RESIDING IN MASSACHUSETTS RESIDE?

         EASTERN DIVISION            CENTRAL DIVISION            WESTERN DIVISION

(PLEASE TYPE OR PRINT)   Christopher Alves, #M-61271 (Pro-se)
ATTORNEY'S NAME _____
ADDRESS  30 Administration Rd, MTC., Bridgewater, Mass. 02324-3230
TELEPHONE NO. ___N/A_____

(Cover sheet local.wpd - 11/27/00)