UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 2005-11090-MLW

CHRISTOPHER ALVES,
        Plaintiff,

v.

ROBERT MURPHY, *et al*,
        Defendants.

## DOC DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR FIRST AFFIRMATIVE DEFENSE-FAILURE TO STATE A CLAIM

### INTRODUCTION

Pro se plaintiff Christopher Alves alleges violations of various constitutional rights and violations of various Management Plans for the Massachusetts Treatment Center ("Treatment Center"). The plaintiff seeks injunctive relief and damages, under 42 U.S.C. § 1983. Defendant Robert Murphy is the Superintendent of the Treatment Center. Complaint, ¶ 7. Defendant John Rull is an employee of the Massachusetts Department of Correction ("DOC"), with the rank of Captain. Complaint, ¶ 8. To the extent that the plaintiff challenges the practice of double bunking at the Treatment Center and the practice of allowing certain individuals adjudicated as sexually dangerous persons ("SDP")[1] to retain certain property, and seeks the transfer of certain classes of inmates/residents from the Treatment Center, the plaintiff fails to state a claim for which relief can be granted. Defendants Murphy and Rull (collectively, the "DOC defendants"), submit this memorandum of law in support of their first affirmative defense, failure to state a claim.

---

[1] Portions of G.L. c. 123A, which provided for the commitment of SDP's like the plaintiff, G.L. c. 123A, §§ 3-6 and 7, were repealed between 1990 and 1999. SDP commitment was reinstated in 1999. See G.L. c. 123A,§§ 12-15. Those SDP's committed prior to 1990 were allowed to retain certain items of property which SDP's committed after 1999 may not possess. Complaint, ¶ 44.

**FACTUAL BACKGR OUND**

A.   **The Plaintiff's Civil Commitment as a Sexually Dangerous Person**.

The plaintiff is a resident of the Treatment Center, having been adjudicated SDP and civilly committed to the Treatment Center. Complaint, ¶6. In approximately February, 2004, the plaintiff was double bunked with another SDP. Complaint, ¶ 27. In May, 2004, the plaintiff alleged that he was bothered by his roommate. Complaint, ¶ 32. Plaintiff was immediately moved to a single room, and thereafter assigned to another double bunk placement. Complaint, ¶ 33.

B.   **The History of the Treatment Center and the Federal Consent Decree Litigation.**

The Treatment Center has previously been under duel management. G.L. c. 123A, § 2 mandated that the Department of Mental Health ("DMH"), had responsibility for the care, treatment and rehabilitation of SDP's with custodial personnel provided by the Department of Correction ("DOC"). St. 1959, c. 615, as appearing in G.L. c. 123A, § 2. The United States District Court for the District of Massachusetts had previously entered consent decrees governing certain aspects of the operation of the Treatment Center which incorporated this dual management scheme. See King v. Greenblatt ("King I"), 52 F.3d 1, 2-3 (1st Cir.), cert. denied, 516 U.S. 863 (1995). Among other things, the consent decrees mandated that Treatment Center residents "have the least restrictive conditions necessary to achieve the purpose of commitment." Id.; see also King v. Greenblatt ("King II"), 127 F.3d 190, 192 (1st Cir. 1997); King v. Greenblatt, 149 F.3d 9 (1st Cir. 1998) ("King III"); King v. Greenblatt, 53 F.Supp.2d 117, 118-20 (D. Mass. 1999) (detailing changes in conditions at Treatment Center from 1972 to 1992).

On January 14, 1994, the Legislature enacted St. 1993, c. 489, § 2, which amended G.L. c. 123A, § 2 by placing sole authority and responsibility over the Treatment Center with DOC.

- 3 -

St. 1993, c. 489, § 2, as appearing in G.L. c. 123A, § 2. See King III, 149 F.3d at 11-12; King, 53 F.Supp.2d at 121.

As a result of this legislative change, in 1994 the Federal District Court (Mazzone, J.), began overseeing what ultimately became the final phase of the federal consent decree litigation. In 1994, the Federal District Court appointed the law firm of Hale and Dorr to represent forty-nine SDP's who called themselves the "Class of 48 + 1" and alleged a number of violations of their state and federal constitutional rights. King, 53 F.Supp.2d at 121.

The Federal District Court reopened another consent decree case concerning the Treatment Center, Harold G. Williams, et al. v. Michael Lesiak, et al., U.S.D.C. C.A. No. 72-571-ADM, and consolidated it with Mitchell G. King, et al. v. Milton Greenblatt, M.D., et al., U.S.D.C. C.A. No. 72-788-ADM, the case involving the Class of 48 + 1 (together "the federal consent decree litigation"). King, 53 F. Supp.2d at 121.

Following the enactment of St. 1993, c. 489, § 2, the Commonwealth moved to vacate or in the alternative to modify the consent decrees by substituting DOC for DMH as the agency designated to have primary responsibility and control for the facility. King I, 52 F.3d at 3. DOC submitted to the Federal District Court an extensive Management Plan for the administration of the Treatment Center. King II, 127 F.3d at 193. The Management Plan encompassed in detail almost every aspect of life at the Treatment Center including policies, regulations, and rules governing staffing, clinical treatment, educational and vocational treatment, a community access program, behavior management, and resident management operations. Id.; King III, 149 F.3d at 15. The Federal District Court permitted DOC to implement its plan and modified the consent

- 4 -

decrees to place responsibility for and control of the Treatment Center in DOC. King II, 127 F.3d at 194.

The Federal District Court, however, did not vacate the consent decrees. King III, 149 F.3d at 16. Instead, the Federal District Court elected to exercise close judicial oversight of DOC's compliance with the consent decrees. Id. at 122-23; King, 53 F.Supp.2d at 122-23. Additionally, the District Court ordered the DOC to submit an amended plan addressing issues raised by the parties. The Amended Plan was filed on November 29, 1996. King, 53 F.Supp. 2d at 122.[2]

### C.     Termination of the Federal Consent Decrees.

From 1994 to June, 1999, the Federal District Court approved, oversaw, and monitored DOC's assumption of sole control over the Treatment Center, including DOC's expansion of sex offender treatment services at the Treatment Center to non-civilly committed state prison inmates ("SPI's"). See, e.g., King, 53 F.Supp.2d at 121-23. Throughout that period, the SDP's continued to assert that the DOC's policies and procedures and its introduction of the SPI's into the facility "essentially turned the Treatment Center into a prison and fundamentally altered the therapeutic community." King III, 149 F.3d at 16. They also complained that DOC's new rules and regulations and the additional SPI population impaired or affected treatment so as to render it ineffective and in violation of G.L. c. 123A and the consent decrees. King, 53 F.Supp.2d at 123, 135.

This final phase of the consent decree litigation culminated in an evidentiary hearing before the Federal District Court in March, 1999. King, 53 F.Supp.2d at 124. At the hearing,

---

[2] Collectively, the original Plan and the Amended Plan will be referred to as the Management Plan.

- 5 -

SDP's reiterated their numerous complaints about DOC's operation of the Treatment Center. See King, 53 F.Supp.2d at 129-31, 134-35. After the hearing, the Federal District Court terminated the consent decrees. King, 53 F.Supp.2d at 136, 139. In doing so, the Federal District Court determined that the SDP's complaints about DOC's policies, procedures, rules, and regulations as well as their complaints about the presence of the SPI's in the Treatment Center, taken as whole, did not render treatment ineffective, did not violate G.L. c. 123A, and did not violate the consent decrees. King, 53 F.Supp.2d at 135, 137. See King III, 149 F.3d at 19.

**ARGUMENT**

A motion to dismiss for failure to state a claim under Fed R. Civ. P. 12(b)(6) will be granted if it appears to a certainty that the plaintiff would be unable to recover under any set of facts. Gonzalez-Bernal v. United States, 907 F.2d 246, 258 (1st Cir. 1990). A court ruling on a motion to dismiss must accept the factual allegations o the Complaint as true and draw all reasonable inferences in the non-moving party's favor. Feinstein v. Resolution Trust Corp., 942 F.2d 34, 37 (1st Cir. 1991).

**I.    THE PLAINTIFFS' § 1983 CLAIM FAILS BECAUSE THEY HAS NOT BEEN DEPRIVED OF A RIGHT SECURED BY THE FEDERAL CONSTITUTION OR LAWS BECAUSE OF THE CONDITIONS OF HIS CONFINEMENT.**

A claim under 42 U.S.C. § 1983 has two essential elements: (1) the challenge conduct must be attributable to a person acting under color of state law, and (2) the conduct must have denied the plaintiff of a right secured by the United States Constitution or by federal law. Soto v. Flores, 103 F.3d 1056, 1061 (1st Cir.), cert. denied, 519 U.S. 819 (1997). The second element requires the plaintiff to prove "that the defendant's conduct was a cause in fact of the alleged deprivation." Soto, 103 F.3d at 1062. Assuming that the defendants were acting under color of

- 6 -

state law for purposes of this argument, the question becomes whether the defendants deprived the plaintiff of any federally protected rights by double bunking him or by depriving him of certain property. It is clear that the defendants did not.

    A.    **The Conditions of the Plaintiffs' Confinement Do Not Violate Their Constitutional Rights.**

To the extent the plaintiff alleges that the practice of double bunking Treatment Center residents in general, his claim fails. In essence, the plaintiff is challenging an aspect of his conditions of confinement. As the First Circuit and Federal District Court concluded in the King litigation, it is not a condition that rises to the level of a constitutional violation.

The administrative and security changes that DOC implemented after assuming full control of the Treatment Center were submitted to the Federal District Court for its review and approval in an extensive and detailed Management Plan. King II, 127 F.3d at 193; King III, 149 F.3d at 15-16. The Management Plan includes provisions for double bunking, including the policies and procedures for its implementation should it become necessary. In the Amended Plan, the DOC represented to the District Court that it was not contemplating double bunking SDP's at that time due to a gradual decline of the population of SDP's.[3] However, it did provide that should double bunking become necessary at a future date, the policies and procedures outlined in the original plan would be followed. The original Plan contains the procedures for the implementation of double bunking. See Complaint, Exhibit 2. The Federal District Court concluded that the plan itself did not violate the federal consent decrees and permitted DOC to implement all aspects of its plan. King, 53 Supp.2d at 121-22.

---

[3] Both the Plan and the amended plan were submitted to the District Court during the time when no new SDP's were being committed to the Treatment Center. See Note 1, above.

- 7 -

More importantly, the fact that these new rules and regulations are in compliance with the consent decrees means that the goal of the facility remains rehabilitative and nonpunitive and, therefore, constitutional. Among other things, these consent decrees require that SDP's "have the least restrictive conditions necessary to achieve the purpose of commitment." King I, 52 F.3d at 2. Consequently, the consent decrees "set a higher standard than the Constitution" in affording treatment for those in the Treatment Center. Cameron v. Tomes, 990 F.2d 14, 19 (1st Cir. 1993), quoting Langton v. Johnson, 928 F.2d 1206, 1217 (1st Cir. 1991). Compliance with the consent decrees, therefore, means that SDP's are provided with more than the Constitution requires. Cameron, 990 F.2d at 19.

The Treatment Center is a unique institution that has specialized staff and facilities to provide sex offender specific treatment. See King, 53 F.Supp.2d at 126-27, 129-30. The individual needs and concerns of the SDP's have properly been left, "to the professional judgement of those charged with operating the institution." Youngberg v. Romeo, 457 U.S. 307, 323 (1982); see King III, 149 F.3d at 13. These administrative decisions are presumptively valid. Doe v. Gaughan, 808 F.2d 871, 884 (1st Cir. 1986).

The Management Plan, which contains the provisions and procedures for double bunking SDP's, was found by the Federal District Court to comply with the federal consent decrees. The Court permitted DOC to implement all aspects of its plan. King, 53 Supp.2d at 121-22. In this light, the plaintiff cannot challenge the practice of double bunking at the Treatment Center generally.[4]

---

[4] Indeed, the First Circuit Court of Appeals recently dismissed a complaint challenging to double-bunking at the Treatment Center in an unpublished decision. *Cote, et al v. Murphy, et al,* 152 Fed. Appx. 6 (2005).

- 8 -

In sum, the fact that the plaintiff has been double bunked simply does not rise to the level of a constitutional violation. The Court should, therefore, dismiss that portion of the plaintiff's complaint challenging the practice of double bunking SDP's.

**B.   The DOC Defendants Have Not Violated Plaintiff's Equal Protection Rights.**

The plaintiff alleges that the DOC defendants have created a "sub-class" of residents at the Treatment Center by allowing those individuals committed to the Treatment Center prior to 1990 to retain various items of property that those SDP's committed after 1999 cannot retain. Complaint, ¶¶ 44, 45. In effect, plaintiff is making an equal protection claim.

"The equal protection clause seeks to ensure that similarly situated people are treated alike." Pearson v. Fair, 935 F.2d 401 (1st Cir. 1991), citing City of Cleburne v. Cleburne Living Center, 473 Mass. 432, 439 (1985). To prevail on an equal protection claim, the plaintiff must prove that he was treated differently from similarly situated persons "based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Barrington Cove Ltd. Partnership v. Rhode Island Housing and Mtg. Finance Corp., 246 F.3d 1, 7 (1st Cir. 2001), quoting Rubinovitz v. Rogato, 60 F3d. 906, 909-10 (1t Cir. 1995). It is well settled that "laws which do not burden a suspect class or a fundamental interest will not be overturned . . . unless the [state's] actions were irrational." Gilbert v. City of Cambridge, 932 F.2d 51, 66 (1st Cir. 1991), quoting Pennel v. San Jose, 485 U.S. 1, 14 (1988). [A]bsent a clear showing of arbitrariness or irrationality, an equal protection challenge to a state regulation . . . is doomed to failure." Gilbert, 932 F.2d at 66.

- 9 -

Here, the plaintiff has failed to allege that he is subject to unequal treatment based on a constitutionally impermissible reason. He is not a member of a protected class.[5] Nor has he made a clear showing that the decision to allow pre-1990 SDP's to retain property not available to post-1999 SDP's is arbitrary or irrational. See Gilbert, 932 F.2d at 66. There are a myriad of reasons why the property levels for pre-1990 SDP's were "grand-fathered" in, safety and security foremost. Additionally, the DOC defendants have a legitimate interest in phasing out certain property while allowing the pre-1990 SDP's who possess the property to retain existing property. This practice is neither arbitrary nor irrational. As the Court said in the consent decree litigation, "This Court and the [First Circuit] have already examined . . . complaints about SDP's about limitations on the amount of clothing, room visits, funds, telephone calls, etc., the First Circuit held that 'the Plan justifies some reduction in these privileges because of past experiences with security, assault, gambling, coercion and interruptions in treatment,' and that '[n]o reduction rises to the level of a constitutional infraction.'" King, 53 F.Supp.2d at 134, quoting King *III*, 149 F.3d at 19.

Thus, the plaintiff has failed to state a claim under the Equal Protection Clause.

## II. THE PLAINTIFF'S PRAYER THAT THIS COURT ORDER THE TRANSFER OF CERTAIN INDIVIDUALS FROM THE TREATMENT CENTER IS WITHOUT MERIT.

The plaintiff requests that this Court "[i]ssue an injunction compelling the [defendants] to immediately attempt to relieve the overcrowding by transferring all state prisoners and civilly

---

[5] However reviled sex offenders may be, that does not elevate the petitioner to membership in a suspect class. Indeed. the Massachusetts Supreme Judicial Court has applied a rational relationship test to equal protection claims advanced by SDP's. See Dutil, petitioner, 437 Mass. 9, 20-21 (2002); Martel v. Fridovich, 14 F.3d 1, 2 (1st Cir. 1993); Doe v. Gaughan, 808 F.2d 871, 883-884 (1st Cir. 1986).

- 10 -

committed residents still serving sentences at the MTC." Complaint. Prayers for Relief, ¶ (f). The plaintiffs request is without merit.

State law requires that SDP's be housed at the Treatment Center except in limited circumstances. *See* G.L. c. 123A, §§ 2, 2A; 103 CMR 460, Transfer Procedures for the Massachusetts Treatment Center.[6] The DOC, therefore, has a limited ability to transfer SDP's still serving a criminal sentence. To be transferred, the SDP must meet the criteria of G.L. c. 123A, §§ 2, 2A and 103 CMR 460. Thus, the DOC defendants cannot transfer all those SDP's still serving a criminal sentence.

The plaintiff also seeks the removal of all of the SPI's from the Treatment Center. The Management Plan, which contains the provisions and procedures for double bunking SDP's, was found by the Federal District Court to comply with the federal consent decrees. The Court permitted DOC to implement all aspects of its plan. King, 53 Supp.2d at 121-22. In doing so, the Federal District Court determined that the SDP's complaints about DOC's policies, procedures, rules, and regulations as well as their complaints about the presence of the SPI's in the Treatment Center, taken as whole, did not render treatment ineffective, did not violate G.L. c. 123A, and did not violate the consent decrees. King, 53 F.Supp.2d at 135, 137. See King III, 149 F.3d at 19.

Thus, the consent decrees were vacated, and the Management Plan approved, with the Court having full knowledge of the introduction of the SPI's and the possibility for future double bunking. Thus, the plaintiff's claims fail.

---

[6] A SDP may be transferred to another facility only if he continues to serve a prison sentence.

- 11 -

### III. THE DOC DEFENDANTS ARE ENTITLED TO THE PROTECTION OF QUALIFIED IMMUNITY.

As public officers in their roles as DOC employees, the DOC defendants are entitled to qualified immunity from a suit for damages in their individual capacities.

In <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982), the Supreme Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Subsequently, the Supreme Court refined the qualified immunity inquiry, writing:

> The contours of the right [allegedly violated] must be sufficiently clear that a reasonable official would understand that what he was doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, . . . but it is to say that in light of pre-existing law the unlawfulness must be apparent.

<u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987) (citation omitted); see <u>Souza v. Pina</u>, 53 F.3d 423, 425 (1st Cir. 1995); <u>Horta v. Sullivan</u>, 4 F.3d 2, 13 (1st Cir. 1993).

The central purpose of affording government officials qualified immunity from suit is to protect them "'from undue interference with their duties and from potentially disabling threats of liability.'" <u>Elder v. Holloway</u>, 510 U.S. 510, 514 (1994), citing <u>Harlow</u>. Qualified immunity plays a critical role in striking the "balance...between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties." <u>Davis v. Scherer</u>, 468 U.S. 183, 195 (1984).

Once a defendant raises a qualified immunity defense, the burden is on the plaintiff to show that the law was clearly established at the time of the alleged violation. <u>Dixon v. Richer</u>, 922 F.2d 1456, 1460 (10th Cir. 1991). If the plaintiff does not meet this initial burden, "the

- 12 -

government official is properly spared the burden and expense of proceeding any further." Powell v. Mikulecky, 891 F.2d 1454, 1457 (10th Cir. 1989). "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) ("The entitlement is an immunity from suit rather than a mere defense to liability; ...it is effectively lost if a case is erroneously permitted to go to trial."); see Harlow, 457 U.S. at 818 (until the "threshold immunity question is resolved, discovery should not be allowed"). Thus, qualified immunity questions should be resolved at the earliest possible stage of the litigation. Anderson, 483 U.S. at 646 n. 6; Harlow, 457 U.S. at 817; see Singer v. Maine, 49 F.3d 837, 844 (1st Cir. 1995) (where a qualified immunity defense is asserted by pre-trial motion, usual summary judgment standard applies regarding existence of genuine issue of material fact and moving party's entitlement to judgment as a matter of law).

Qualified immunity is a powerful defense. "[Q]ualified immunity sweeps so broadly that 'all but the plainly incompetent or those who knowingly violate the law' are protected from civil rights suits for money damages." Hegarty v. Somerset County, 53 F.3d 1367, 1373 (1st Cir.), cert. denied, 516 U.S. 1029 (1995) (citation omitted); see Hunter v. Bryant, 502 U.S. 224, 229 (1991); Malley v. Briggs, 475 U.S. 335, 343 (1986). Qualified immunity protects law enforcement officers from "bad guesses and gray areas" and ensures that they are liable only "for transgressing the bright lines." Wilson v. Layne, 141 F.3d 111, 114 (4th Cir. 1998), quoting Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992), cert. denied, 506 U.S. 1080 (1993).

The First Circuit has established a two-part inquiry for qualified immunity analysis:

> First, the court must establish whether the constitutional right
> asserted by the plaintiff was 'clearly established' at the time of the

- 13 -

>alleged violation. . . .Second, the court must ask whether a 'reasonable official situated in the same circumstances should have understood that the challenged conduct violated that established right.'

St. Hilaire v. City of Laconia, 71 F.3d 20, 24 (1st Cir. 1995), cert. denied, 518 U.S. 1017 (1996), citing Hegarty, 53 F.3d at 1371 & Burns v. Loranger, 907 F.2d 233, 235. Qualified immunity, therefore, does not turn on the government official's state of mind. Rather, it turns on the "objective legal reasonableness " of the official's action, in light of legal rules that were "clearly established" at the time the action was taken. Anderson, 483 U.S. at 639; see Wood v. Clemons, 89 F.3d 922, 927 (1st Cir. 1996) ("The 'touchstone' of the qualified immunity question is the concept of 'objective legal reasonableness.'") (citation omitted). The inquiry becomes whether the official acted as a reasonable official might in light of the information that the official possessed at the time of the challenged conduct. Wood, 89 F.3d at 929-30.

As the Supreme Court has stated, a "necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." Siegert v. Gilley, 500 U.S. 226, 232 (1991). As a predicate to the "objective reasonableness" inquiry, therefore, "a plaintiff must establish that a particular defendant violated the plaintiff's federally protected rights." Singer, 49 F.3d at 844 (citation and internal quotation omitted); see Brown v. Hot, Sexy and Safer Productions, Inc., 68 F.3d 525, 531 (1st Cir. 1995), cert. denied, 516 U.S. 1159 (1996).

Whether an asserted federal right was clearly established at a particular time so that a public official who allegedly violated the right has qualified immunity is a question of law, not one of legal facts. Elder, 510 U.S. at 516; see Hegarty, 53 F.3d at 1373. Accordingly, appellate

- 14 -

review of qualified immunity must be conducted in light of all relevant precedents, not simply those cited to or discovered by the parties or the trial court. Id.

> For purposes of determining qualified immunity, the officer's actions are measured by a standard of "objective legal reasonableness...in light of the legal rules that were clearly established at the time [they] were taken," [footnote omitted]. Anderson v. Creighton, 483 U.S.. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed. 2d 523 (1987) (internal quotation omitted).

St. Hilaire, 71 F.3d at 24. "It is not enough for the constitutional right to be 'clearly established' at a highly abstract level; what matters is whether in the circumstances faced by the official, he should reasonably have understood that his conduct violated clearly established law." Ringuette v. City of Fall River, 146 F.3d 1, 5 (1st Cir. 1998), citing Berthiaume v. Caron, 142 F.3d 12, 15 (1st Cir. 1998). "This qualified immunity standard leaves 'ample room for mistaken judgments.'" Ringuette, 146 F.3d at 5, quoting Malley, 475 U.S. at 343; see Berthiaume, 142 F.3d at 15 (the question is whether in the circumstances that confronted the official, a reasonable official would have understood that what he is doing violated that right). Qualified immunity permits some leeway for mistakes, even negligent ones, without the consequence of legal liability. Foster, 844 F.Supp. at 24.

While "the exact conduct at issue need not have been held to be unlawful in order for the law governing an officer's actions to be clearly established, the existing authority must be such that the unlawfulness of the conduct is manifest." Wilson, 141 F.3d at 114; see Souza, 53 F.3d at 425 (right must have been clearly established at time of the challenged conduct). Qualified immunity may exist even though, in hindsight, a court might determine that the action of the official violated the Constitution. Berthiaume, 142 F.3d at 15; see Wood, 53 F.3d at 1375-76

- 15 -

(inquiry must be made based on information available to the official at the time the challenged conduct occurred without indulging hindsight).

In this case, the plaintiff seeks relief because the defendants instituted double bunking at the Treatment Center. As discussed in Section I, above, double bunking does not constitute a constitutional violation. Thus, applying the first prong of the two pronged analysis delineated in St. Hilaire, the defendants are entitled to qualified immunity, because, as there is no constitutional violation by implementing double bunking, there can be no clearly established constitutional right asserted by the plaintiffs. St. Hilaire, 71 F.3d at 24.

However, even assuming arguendo that double bunking at the Treatment Center is unconstitutional, the defendants are still entitled to qualified immunity. The mere fact that double bunking is provided for in the Management Plan which was approved by the Federal District Court argues against any contention that the defendants were violating a "clearly established' constitutional right. See Ringuette, 146 F.3d at 5 (citations omitted).  In the circumstances present her, a reasonable official would not believe he was violating that law by implementing double bunking.  See Berthiaume, 142 F.3d at 15. The Court, therefore, should dismiss the damage claims against the defendants in their individual capacities.

IV.    **THE PLAINTIFF CANNOT RECOVER MONEY DAMAGES AGAINST THE DEFENDANTS IN THEIR OFFICIAL CAPACITIES UNDER 42 U.S.C. § 1983.**

The plaintiffs seek to recover monetary damages against the DOC defendants. The plaintiffs have sued the defendants both individually and in their official capacities.  Complaint, ¶¶ 7, 8.

To state a claim for monetary damages under 42 U.S.C. § 1983, a plaintiff must allege that a "person" acting under color of law deprived him of a federal statutory or constitutional

- 16 -

right.  See 42 U.S.C. § 1983.  State officials acting in their official capacities are not "persons" within the meaning of § 1983 for purposes of monetary damages.  See Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989) ("a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office . . . As such, it is not different from a suit against the State itself"); Kentucky v. Graham, 473 U.S. 159, 165-66 (1985); O'Malley v. Sheriff of Worcester County, 415 Mass. 132, 141 n. 13 (1993) (same).  There is no dispute that the defendants are state officials.  See Complaint, ¶¶ 7, 8.  The plaintiffs' claims for money damages against the defendants, in their official capacities, fail as a matter of law.  This Court should, therefore, dismiss these claims.

        Respectfully Submitted,
        DOC Defendants Robert Murphy and John Rull
        By their Attorney

        NANCY ANKERS WHITE
        Special Assistant Attorney General

by:    /s/ Brian P. Mansfield
        Brian P. Mansfield, Counsel
        Department of Correction
        Massachusetts Treatment Center
        30 Administration Road
        Bridgewater, Massachusetts 02324
        Telephone:  (508) 279-8180
        Facsimile :  (508) 279-8181
        BBO Number 564671

Dated: October 25, 2006

**CERTIFICATE OF SERVICE**

    I hereby certify that I did this day serve a photocopy of the above document upon the Plaintiff by institutional mail.

        /s/ Brian P. Mansfield
Dated: October 25, 2006        Brian P. Mansfield