# United States District Court
# District of Massachusetts

CHRISTOPHER ALVES,
    Plaintiff,

v.                        CIVIL ACTION NO. 2005-11090-RBC[1]

ROBERT MURPHY, ETC.,
JOHN RULL, ETC.,
STEPHEN CORRIGAN, ETC.
    Defendants.

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS (#19)

COLLINGS, U.S.M.J.

### I. Introduction

Plaintiff, Christopher Alves ("Alves"), is currently civilly committed as a sexually dangerous person ("SDP") at the Massachusetts Treatment Center ("MTC") under Mass. Gen. L. ch. 123A. In this civil rights action pursuant to 42

---

[1]
    With the parties' consent this case has been reassigned to the undersigned for all purposes, including trial and the entry of judgment, pursuant to 28 U.S.C. §626(c).

U.S.C. § 1983, Alves alleges that the defendants, officials at the MTC, placed him at risk of harm by failing to adhere to certain mandatory procedures prior to implementing a double-bunking policy.  He also alleges that the defendants have violated equal protection principles by granting privileges to certain residents at the MTC, but not to others.

On October 25, 2006, the defendants, pursuant to Fed. R. Civ. P. 12(b)(6), filed their DOC [Department of Corrections] Defendants' Memorandum of Law in Support of Their First Affirmative Defense–Failure to State a Claim.  (#19)  On December 7, 2006, Alves filed his Memorandum of Law in Support of Plaintiff's Opposition to DOC Defendants' Memorandum of Law in Support of Their First Affirmative Defense–Failure to State a Claim.  (#25)  The matter is therefore poised for resolution.

## II. Facts

Alves is an involuntarily civilly-committed resident at the MTC.  (Verified Complaint # 3 ¶ 6)    The defendant Robert Murphy ("Murphy") is the Superintendent of the MTC.  (#3 ¶ 7)  The defendant John Rull ("Rull") is a Shift Commander with the rank of Captain at the MTC.  (#3 ¶ 8)   The defendant Stephen Corrigan, M.A., L.M.H.C. ("Corrigan") is an employee of Forensic Health Services, and was contracted by the MTC to provide treatment

2

specific to sex offenders to civilly committed residents.  (#3 ¶ 9)  Because of overcrowding at the MTC, the defendants were forced to implement a double-bunking policy; the policy resulted in the placement of residents deemed "sexually dangerous" with fellow residents. (#3 ¶ 22)  The protocols regarding double-bunking call for the MTC first to attempt to relieve overcrowding by reassignment of housing, and then for the MTC to conduct security and clinical assessments of each resident's compatibility and suitability for double-bunking. (#3 ¶ 25 & Exh. 1 at 2)

In or around February, 2004, defendants Rull and Corrigan conducted an interview with Alves to assess his compatibility for double-bunking.  (#3 ¶ 27)  The defendants inquired whether Alves would consider double-bunking with another resident, John MacIntyre ("MacIntyre").  (#3 ¶ 28)  MacIntyre had originally been convicted of raping an adolescent male, and had recently escaped from the Treatment Center's Community Access House.  (#3 ¶ 29) Alves told Rull and Corrigan "that he did not feel comfortable being double-bunked with resident MacIntyre because he [MacIntyre] had just recently escaped from the Treatment Center."  (# 3 ¶ 30)  Alves requested to be housed with one of two other residents.  (#3 ¶ 30)   Contrary to Alves' wishes, the defendants decided to double-bunk Alves with MacIntyre; defendants said the

alternative was to place Alves in the MTC Minimum Privilege Unit pending an Observation of Behavior Report, which Alves did not opt to do. (#3 ¶ 31)

In May, 2004, Alves informed Rull that "for several nights he would awake to find resident MaIntyre [sic] lifting up his bed sheets looking at him and felt that resident MacIntyre was putting medication in his food." (# 3 ¶ 32) The defendants "immediately thereafter" (# 3 ¶ 33) moved Alves to a single room temporarily and then a short time later, "reassigned another roommate in a housing unit separate from resident MacIntyre." (#3 ¶ 33)

### III.  Applicable Law

### A.  Motion to Dismiss Standard

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) requires the Court to "assume the truth of all well-plead facts and give the plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007).  "To survive a motion to dismiss, a complaint must establish 'a plausible entitlement to relief.'" *Alvarado Aguilera v. Negron*, –F.3d–, 2007 WL 4247665, at *1 (1st Cir. Dec. 5, 2007) (quoting *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1967 (2007)).  In other words, the complaint must allege facts that give rise to "a reasonable expectation" of relief, *Bell Atlantic*, 127 S. Ct. at 1965, and  the claims in the complaint must be

4

specific enough to cross the line "from conceivable to plausible," *id.* at 1974.

Despite this "plaintiff-friendly vantage," *Ruiz,* 496 F.3d at 4, a court is not

obliged "to credit bald assertions, unsupportable conclusions, and opprobrious

epithets," *id.* (internal quotations and citation omitted). Thus, courts have no

duty "'to conjure up unpleaded facts that might turn a frivolous claim ... into a

substantial one.'" *Bell Atlantic*, 127 S. Ct. at 1969 (quoting *O'Brien v. DiGrazia*,

544 F.2d 543, 546, n.3 (1st Cir. 1976), *cert. denied sub nom. O'Brien v. Jordan*,

431 U.S. 914 (1977)).

## B. Claims under 42 U.S.C. § 1983

Under 42 U.S.C. § 1983, a plaintiff must demonstrate that 1) the

challenged conduct is attributable to a person acting under color of state law,

and 2) the conduct must have denied the plaintiff a right secured by the United

States Constitution or a federal law.  *Soto v. Flores*, 103 F.3d 1056, 1061 (1st

Cir.), *cert. denied*, 522 U.S. 819 (1997).  The analysis here focuses on the

second element, *viz.*, whether Alves has alleged the deprivation of a

constitutional right.

First, to the extent that Alves alleges that the MTC's failure to follow its

own procedures regarding double-bunking[2] constitutes a constitutional violation, Alves fails as a matter of law to state a claim. *See Martinez v. Colon*, 54 F.3d 980, 989 (1st Cir.) ("It is established beyond peradventure that a state actor's failure to observe a duty imposed by state law, standing alone, is not a sufficient foundation on which to erect a section 1983 claim."), *cert. denied*, 516 U.S. 987 (1995); *see also Seling v. Young*, 531 U.S. 250, 265 (2001) (stating that "[i]t is for the [state] courts to determine whether the Center is operating in accordance with state law and provide a remedy"). Similarly, the MTC's decision to double-bunk the plaintiff, *simpliciter*, does not present a constitutional infraction. *Cf. Bell v. Wolfish*, 441 U.S. 520, 542 (1979) (there is no "'one man, one cell' principle lurking in the Due Process Clause").[3] Indeed, as the complaint alleges, the MTC plan, itself the subject of years of litigation, *see King v. Greenblatt*, 53 F. Supp.2d 117 (D. Mass. 1999) (detailing history of litigation), contemplates that at times of overcrowding, double-bunking cannot

---

[2]

Alves alleges in this regard that "[u]pon information and belief, defendant's [sic] ignore and do not follow the protocol's [sic] for assessing resident's suitability and compatibility for double-bunking." (# 3 ¶ 38)

[3]

The First Circuit has recognized under *Bell v. Wolfish* that double-bunking "is not automatically unconstitutional for pretrial detainees," *Inmates of Suffolk County Jail v. Rufo*, 12 F.3d 286, 293-94 (1st Cir. 1993), but that the practice might violate due process when combined with other adverse conditions, such as "double-celling in very small quarters, with lack of security against assaults and possibly other threats (e.g., disease)," *id.*

be avoided.  (*See* # 3 Exh. 1 at 2)

On the other hand,  the gravamen of the complaint is that the defendants knew or should have known that bunking Alves with MacIntyre, a resident who had been convicted of raping an adolescent male, would put Alves at risk of harm.  Alves' complaint can thus be read as attempting to state a claim based on his right to reasonably safe conditions of confinement.  In particular, for involuntarily committed patients such as Alves, the substantive due process clause of the Fourteenth Amendment guarantees "the right to personal security," *Youngberg v. Romeo*, 457 U.S. 307, 315 (1982), and the right to conditions of reasonable safety, *id.* at 324.[4]  *See also Cameron v. Tomes*, 990 F.2d 14, 18 (1st Cir. 1993) ("It is settled that those who are confined by the state, for whatever reason, are entitled under the Constitution to food, clothing, medical care, and reasonable efforts to secure physical safety.").  The Court turns to an analysis of such a claim.

---

[4]

Alves otherwise broadly alleges that the practice of "double-bunking homosexuals with other homosexuals provides unlimited opportunities to engage in sexual activity, which is both counter-productive to treatment, against institutional regulations, as well as increases the risk of sexually transmitted diseases." (# 3 ¶ 41)  Alves has not alleged facts that he himself has been harmed in any of the ways he alleges here. *Cf. Shedlock v. Murphy*, 2007 WL 2746803, at *1 (D. Mass. Sept. 13, 2007) (rejecting generalized complaints about the Treatment Center, and noting that "[s]uch standing as the plaintiffs may have to obtain declaratory or injunctive relief must be carefully tailored to address the particular facts and circumstances presented by the plaintiffs as harm to them personally"); *see also Purvis v. Ponte*, 929 F.2d 822, 825 n.6 (1st Cir. 1991) (plaintiff inmate lacks standing to complain about the constitutional rights of other inmates).

The right to safe conditions is "not absolute," *Youngberg*, 457 U.S. at 320, and any analysis of a substantive due process claim in this context must take into account that "an institution cannot protect its residents from all danger of violence if it is to permit them to have any freedom of movement. The question then is not simply whether a liberty interest has been infringed but whether the extent or nature of the . . . lack of absolute safety is such as to violate due process," *id.* Here, essentially, the plaintiff alleges that, due to overcrowding, the defendants were forced to double-bunk him. Alves complains that he was bunked with a roommate with whom he was incompatible, and that the defendants should have been aware of the risk of harm that would befall the plaintiff because MacIntyre had been convicted of raping an adolescent boy, and Alves "projects adolescent mannerisms and characteristics." (#3 ¶ 37) Alves alleges a due process violation because the defendants failed to prevent the harm to which Alves was exposed, that is, MacIntyre's peering at Alves while he slept, and Alves' perceived fear that his cellmate had put something in his food.

The Court concludes that Alves has failed to state a due process violation because "the extent or nature of the . . . lack of absolute safety," *Youngberg*, 457 U.S. at 320, in this case is simply not of constitutional magnitude: Alves alleges an isolated incident in which he was not seriously injured. The allegations

8

themselves establish that once Alves alerted the defendants to his roommate's behavior, the defendants immediately transferred Alves to another housing unit. Thus, according to the complaint itself, the harm itself – the "extent or nature . . . of the lack of absolute safety"– was de minimus and short-lived; even under a liberal reading of the complaint, the defendants could not have acted more reasonably or expeditiously in remedying the perceived risk of harm.

In reaching this conclusion, the Court recognizes that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg*, 457 U.S. at 321-322. The Court also acknowledges that failure-to-protect claims are analyzed under different standards in different institutional settings, and that "[t]he degree of affirmative care expected of state officials may vary with the type of physical custody involved." *Shaw by Strain v. Strackhouse*, 920 F.2d 1135, 1144 (3rd Cir. 1990) (applying *Youngberg*'s "professional judgment" standard to failure-to-protect claim of involuntarily committed patient); *cf. Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (deliberate indifference standard applies to inmate's failure-to-protect claim); *Calderón- Ortiz v. Laboy-Alvarado*, 300 F.3d 60, 63 (1st Cir. 2002) (analyzing constitutional claims of pre-trial detainees, who like civil

9

committees, may not be punished, under the Due Process Clause of the Fourteenth Amendment, but applying the Eighth Amendment "deliberate indifference" standard to pre-trial detainee's failure-to-protect claim). Nevertheless, "[t]he strand of substantive due process jurisprudence primarily at issue here," *Davis v. Rennie*, 264 F.3d 86, 97 (1ˢᵗ Cir. 2001), *cert. denied*, 535 U.S. 1053 (2002), that is, the duty of the state to protect those that it has confined, recognizes in various ways that the nature and extent of the alleged harm is significant in assessing whether a constitutional violation has occurred. Thus, in the context of the Eighth Amendment, "[i]t is not . . . every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety. . . . [T]he deprivation alleged must be, objectively, sufficiently serious." *Farmer*, 511 U.S. at 834 (internal quotations and citation omitted). Similarly, the length of time to which an inmate is exposed to an adverse condition is relevant in assessing whether a constitutional violation has occurred. *See, e.g., Hutto v. Finney*, 437 U.S. 678, 686-687 (1978); *see also Bell*, 441 U.S. at 542 (1979) ("genuine privations and hardship over an extended period of time might raise serious questions under the Due Process Clause").

    With these general tenets in mind, the Court does not read *Youngberg* to

impose liability in a case such as this; to hold otherwise would be to oblige the defendants to screen potential roommates to eliminate all conceivable risk, no matter how generalized. *Youngberg* pragmatically recognizes that institutions cannot be constitutionally charged with providing "absolute safety," because some risk naturally inheres in the nature of the institutional setting. Rather, the inquiry focuses on "whether the extent or nature of the . . . lack of absolute safety is such as to violate due process." *Youngberg,* 457 U.S. at 320.

*Shaw by Strain v. Strackhouse*, 920 F.2d 1135 (3rd Cir. 1990), which analyzed the failure-to-protect claim of an involuntarily committed patient, is instructive. In *Shaw*, the plaintiff suffered from severe retardation and had been institutionalized for many years. The plaintiff suffered two instances of abuse, although prior to the incidents the plaintiff had experienced no history of neglect or abuse. *Shaw,* 920 F.2d at 1143. The first incident of abuse resulted in lacerations around the plaintiff's anus; the second, which occurred roughly two weeks later, resulted in injuries around the plaintiff's penis. The *Shaw* Court concluded that summary judgment had properly been entered in favor of the state officials in charge of supervising the plaintiff in the first instance, but not the second. The Court concluded that the initial sexual assault amounted to an "isolated mishap," *id.*, and that therefore the institutional staff's

11

failure to prevent the harm amounted to simple negligence which did not give
rise to a due process claim under § 1983.  The Court reasoned:

> We think it necessary . . . to contrast this failure to
> supervise with the failure at issue in *Youngberg*, in
> which the Supreme Court held that the state has an
> affirmative duty to protect involuntarily committed
> mental patients.  [The *Youngberg* plaintiff] himself was
> injured not once or twice, but sixty or seventy times.
> Although the failure to prevent a pattern of attacks,
> injuries, or violent behavior is actionable, the right to
> protection is not activated by an isolated mishap, or
> called into question by each bruise that a patient may
> suffer.

*Id.* at 1143 (internal quotations and citation omitted).

The *Shaw* Court determined that the second incident was actionable
because the defendants "were aware that [the plaintiff] probably had been
attacked, that the perpetrator still had frequent and unsupervised access to him,
and that another attack was possible. . . .  Still nothing was done."  *Shaw,* 920
F.3d at 1149.

Likewise, in this case nothing in the complaint suggests that MacIntyre
and Alves had a history of altercation, or that MacIntyre had a history of
aggression toward other residents.  Given that Alves' only complaint to Rull and
Corrigan during the assessment interview was "that he did not feel comfortable
being double-bunked with resident MacIntyre because he [MacIntyre] had just

recently escaped from the Treatment Center," (# 3 ¶ 30), the facts do not support the allegation that the defendants "knew" that double bunking Alves with MacIntyre would result in harm. His claim that they "should have known" that bunking a "known homosexual," (#3 ¶ 34) with a resident with "adolescent mannerisms and characteristics," (#3 ¶ 36), at most suggests that the defendants negligently overlooked the possibility of harm. *DeToledo v. County of Suffolk*, 379 F. Supp.2d 138, 144 (D. Mass. 2005) ("'[t]he Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty or property'") (quoting *Daniels v. Williams*, 474 U.S. 327, 328 (1986)).

However, even assuming that the defendants' actions here amounted to more than negligence, the Court would still conclude that the facts alleged do not state a constitutional violation. The Court in *Youngberg* held that the "professional judgment" standard was the appropriate test for determining whether a substantive due process right has been violated in the context of those of who have been involuntary committed. *Youngberg*, 457 U.S. at 322-323; *see also Cameron,* 990 F.2d at 20-21 (applying professional judgment standard in context of MTC). Under that standard, "the Constitution only requires that the courts make certain that professional judgment in fact was

13

exercised.  It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." *Youngberg,* 457 U.S. at 321 (internal quotations and citations omitted).  The standard acknowledges "that courts must show deference to the judgment exercised by a qualified professional," *id.* at 322, and that "[f]or these reasons, the decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment," *id.* at 323 (footnotes omitted).

In this case, Alves' allegations can be read to contend that the defendants violated the professional judgment standard because they "knew, or should have known that, by double-bunking a resident convicted of and sexually attracted to adolescent males, with another resident who projects adolescent mannerisms and characteristics would create a foreseeable risk of harm while double-bunked."  (#3 ¶ 36) In short, Alves contends that the defendants, as professionals, failed to recognize Alves' incompatibility with MacIntyre. However, nothing in the complaint plausibly suggests that the decision constituted "such a substantial departure from accepted professional judgment,

practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg*, 457 U.S. at 323. The complaint alleges that defendant Rull, a shift commander, and defendant Corrigan, a licensed therapist, conducted an interview and assessment and determined that MacIntyre and Alves should be bunked together. (# 3 ¶ 27) But even if the Court assumes for present purposes that the defendants failed to exercise the requisite professional judgment in deciding to double-bunk the two residents (an elusive standard in this context given the mix of factors that the defendants must consider in double-bunking two residents[5]), whatever lapse in judgment was immediately remedied when Alves complained to the defendants about MacIntyre's behavior, and the defendants promptly moved Alves from the cell. *Cf. Burrell v. Hampshire County*, 307 F.3d 1, 8 (1st Cir. 2002) (stating, in the context of pre-trial detention, that "a reasonable response

---

[5]

    The MTC protocol by which the defendants would have been guided in deciding to double-bunk Alves and MacIntyre assumes that the placement of residents in double-bunking arrangements implicates both security concerns (e.g., whether two residents pose a flight risk, or are enemies), and therapeutic concerns (e.g., whether two residents are compatible). (*See* # 3, Exh. 1 at 2) Thus, despite Alves' complaint to Rull and Corrigan that he did not feel comfortable bunking with MacIntyre because MacIntyre had recently escaped, the institutional protocol only requires that two residents with a history of escape not be bunked together. In the face of Alves' other generalized allegations that the defendants knew or should have known that bunking Alves with MacIntyre would put Alves at risk, the Court declines to second-guess the mix of factors that the defendants must have considered in deciding to bunk Alves and MacIntyre, especially where the defendants quickly remedied the alleged harm. *Cf. Cameron*, 990 F.2d at 20 ("The administrators are responsible to the state and to the public for making professional judgments of their own, encompassing institutional concerns as well as individual welfare. Nothing in the Constitution mechanically gives controlling weight to one set of professional judgments. Indeed, when it comes to constitutional rights, none of the professionals has the last word.").

clearly defeats the claim of constitutional violation"); *cf. also Aguilar v. United States Immigration and Customs Enforcement Div. of the Dep't of Homeland Security*, – F.3d –, 2007 WL 4171244, *18 (1st Cir. Nov. 27, 2007 ) (claim of willful interference with substantive due process rights "is belied by the . . . concession that [government] took at least some measures to alleviate any resultant harm" and so that "facts alleged suggest no more than negligence . . . "). In short, the Court must conclude that Alves has failed to allege a constitutionally-cognizable injury because the facts alleged do not plausibly support the claim that Rull's and Corrigan's decision to bunk Alves with MacIntyre constituted a substantial departure from accepted professional opinion, and any such allegation is belied by the promptness and reasonableness of the defendants' actions in response to Alves' plaints.

Finally, the Court takes some instruction from cases analyzing failure-to-protect claims under the Eighth Amendment.[6] *Cf. Battista v. Dennehy*, 2006 WL

---

[6]

The First Circuit analyzes constitutional claims of pre-trial detainees, who like civil committees, also may not be punished, under the Due Process Clause of the Fourteenth Amendment, but draws on Eighth Amendment jurisprudence and applies the "deliberate indifference" standard when analyzing pre-trial detainee's failure-to-protect claims. *Calderón-Ortiz v. Laboy-Alvarado*, 300 F.3d 60, 64 (1st Cir. 2002) (noting that constitutional protections due to pre-trial detainees, are at least as great as that under the Eighth Amendment). Although the Court has no reason to believe that the "professional judgment" standard does not apply to failure-to-protect claims of civil committees, the principles underlying the failure-to-protect claims, much more frequently litigated in the context of pretrial detainees or prisoners, provides some broad guidance. *Cf. Bell*, 441 U.S. at 546 (noting that "[t]here must be a mutual accomodation between institutional needs and objectives and the provisions of the Constitution that are of general application") (internal quotations and citation omitted).

1581528, at *7 (D. Mass. Mar. 22, 2006) (noting that although rights of a involuntarily committed person are "grounded in the Fourteenth Amendment's Due Process clause, courts have looked to Eighth Amendment jurisprudence for guidance"); *Espaillat v. Mousseau*, 2005 WL 1168438, at *2 (D. N.H. May 18, 2005) ("corrections officers do not violate the Constitution every time a cell transfer request is denied and the plaintiff is subsequently assaulted by another prisoner"). In a factually similar case, *Purvis v. Ponte*, 929 F.2d 822 (1st Cir. 1991), prison officials paired up the plaintiff, an inmate, with a cellmate who was hostile to the plaintiff's sexual orientation and who "lurked" over him, *Purvis,* 929 F.2d at 824; the plaintiff was also bunked with other cellmates whom he feared because of their alleged hatred of homosexuals and people of color. The First Circuit held that the plaintiff had failed to state a failure-to-protect claim under the Eighth Amendment. The Court reasoned that the Eighth Amendment did not entitle the plaintiff to his room-mate of choice, nor did it require the defendants to screen the plaintiff's prospective cellmates to eliminate the risk of "'gay bashing,'" where the allegations did "not indicate either that the prison authorities subjected him to an unreasonable risk of harm or that defendants failed to respond reasonably to his fears." *Id*. at 825. The Court also emphasized that "any perceived threat to Purvis's safety was short-

lived," and promptly removed. *Id.* The First Circuit concluded that, "'[t]o establish fear of constitutional dimensions, an inmate must show more than simple anxiety.'" *Id.* at 825 (quoting *Shrader v. White*, 761 F.2d 975, 979 (4th Cir.1985)). Thus, it was not enough to allege "that Purvis was afraid of his room-mates because of his perception that they were hostile or behaved erratically." *Id.* The Court concluded that "[a]llegations that an inmate's cell-mate has exhibited unspecified general 'hostility' towards homosexuals, has assaulted a corrections officer, has refused to live with Blacks, or exhibits bizarre behavior, are not, standing alone, sufficient to establish that the inmate was subject to an unreasonable risk of harm." *Id.* at 825-826 (footnote omitted).

Likewise, here, the circumstances alleged by Alves are insufficient to give rise to an actionable constitutional violation, and the Court concludes that Alves' failure-to-protect claim must be dismissed.[7]

## C. Claims under Equal Protection Clause

Alves also alleges that the defendants grant certain privileges to the SDP

---

[7]

Because the Court concludes that Alves has not alleged a constitutional violation, the Court does not reach the defendants' qualified immunity argument.

population committed under prior enactments of ch. 123A,[8] but withhold these privileges from residents committed under the current statutory enactment.  In particular, Alves alleges that the defendants permit certain SDP's "to retain at their own expense certain personal luxuries, while denying the new population committed under the 1999 version of ch. 123A the privilege to retain at their own expense the same level of personal luxuries."  (#3 ¶ 44) (footnote omitted)  These luxuries include, *inter alia*, televisions, personal computers and other electronics, hair and beard trimmers, and personal clothes and linens.  (#3 ¶ 44 n.4)  According to Alves, this differential treatment creates an unconstitutional "sub-class" at the MTC.  (#3 ¶ 45)  The defendants move to dismiss this claim contending that Alves fails to state a claim under equal protection principles.  The Court agrees.

It is well established that a classification such as Alves challenges here "does not deny equal protection of the laws so long as it can be said to be rationally related to a legitimate governmental purpose."  *Doe v. Gaughan*, 808

---

[8]

In 1990, the state legislature repealed ch. 123A, §§ 3-6, and 7, and for a period of ten years, no new "sexually dangerous person" classifications or commitments were permitted in Massachusetts.  *See generally Commonwealth v. Bruno*, 432 Mass. 489, 494 (2000) (detailing history of SDP statute).   However, in repealing the statute, the legislature provided that anyone committed to the treatment center before the repeal of the statute "'shall be maintained at said treatment center.'"  *Commonwealth v. Tate*, 424 Mass. 236, 238 n.3  (quoting St. 1990, c. 150, § 104), *cert. denied,* 522 U.S. 832 (1997).  On September 10, 1999, the state legislature enacted legislation again permitting civil commitments of sexually dangerous persons.

F.2d 871, 881 (1st Cir. 1986) (noting that "legislative classifications based upon mental retardation are presumed to be valid and will survive an equal protection challenge if rational") (citing *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432 (1985)). *See also See Heller v. Doe by Doe*, 509 U.S. 312, 319 (1993) ("a classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity"). Accordingly, the First Circuit has observed that "[t]here is no constitutional requirement . . . that all mental patients in state-run hospitals receive the same rights or care." *Doe,* 808 F.2d at 881. Instead, a classification subject to rational basis analysis "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification," *Heller,* 509 U.S. at 320 (internal quotations and citation omitted), and the state "need not actually articulate at any time the purpose or rationale supporting its classification," *id.* (internal quotations and citations omitted).

The defendants posit that it is neither arbitrary nor irrational for the state to "grandfather" in privileges that it had previously extended to those committed under the prior enactment of ch. 123A. (# 19 at 9) Further, the defendants argue that they have a legitimate interest in phasing out certain

privileges for security and safety reasons. (*Id.*) In the Court's view, these represent conceivable bases for differential treatment. *Cf*. *Doe,* 808 F.2d at 883 ("When a state decides to confer a benefit upon a segment of its population, it may decline to provide the exact same level of benefits to another segment, so long as its decision is rational."). Alves has neither alleged nor articulated a contrary argument, and so his equal protection claim must fail. *Cf. Boivin v. Black*, 225 F.3d 36, 44 (1st Cir. 2000) ("the Supreme Court has made it pellucid that a person who challenges the rationality of a statute must negate every plausible basis that conceivably might support it").

### III.  CONCLUSION

For the above reasons, it is ORDERED that the Defendants' Motion to Dismiss for Failure to State a Claim (# 19) be, and the same hereby is, ALLOWED. With respect to plaintiff's claims based on state law, the Court declines to assert supplemental jurisdiction over them and they shall be dismissed without prejudice. The plaintiff is free to pursue the claims based on state law in state court. Judgment shall enter accordingly.


/s/ Robert B. Collings
ROBERT B. COLLINGS

21

United States Magistrate Judge

January 14, 2008.